HARRY HARPER WAGNER and RUTH N. WAGNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wagner v. Commissioner
Docket No. 260-74
United States Tax Court
T.C. Memo 1978-49; 1978 Tax Ct. Memo LEXIS 470; 37 T.C.M. (CCH) 254; T.C.M. (RIA) 780049; January 31, 1978, Filed Arthur L. Berger and John S. Oyler, for the petitioners. Alan E. Cobb, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to the Tax Year
Deficiency
Sec. 6653(b)
Sec. 6654
1959
$25,335.80
$12,667.90
1960
56,420.36
28,210.18
1961
26,577.61
13,934.39
1962
2,651.56
1,359.22
1963
1,539.32
769.66
7.83
1964
17,427.05
8,713.53
13.12
1965
39,073.99
19,537.00
1966
40,874.53
20,437.27
1967
2,709.22
1,354.61
1968
540.02
270.01
1969
37,100.36
18,550.18
1970
13,290.61
6,645.31
*471 The issues remaining for decision are (1) whether petitioners understated their taxable income for the years 1959 through 1966, and (2) whether, if petitioners did understate their taxable income for this period, such understatement was due to fraud. Absent a finding of fraud, assessment of a deficiency for the years 1959 through 1966 would be barred by the statute of limitations. Respondent has conceded on brief that petitioners are not liable for the deficiencies in tax or additions to tax under section 6653(b) [1] for the taxable years 1967 through 1970. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Harry Harper Wagner, and Ruth N. Wagner, husband and wife, resided in Hershey, Pennsylvania, at the time their petition was filed herein. Petitioner Harry Harper Wagner filed separate individual income tax returns for the years 1959 and 1960 with the office of the Internal Revenue Service in Philadelphia, Pennsylvania. Petitioners filed joint income tax returns for the years 1961 through 1970 with the same office. *472 Petitioners' income tax returns were prepared on the cash basis with inventories. [2]
During the years in issue, petitioner operated a retail grocery store in Hershey, Pennsylvania. Petitioner began in the grocery business in 1938, when he joined his father in an equal partnership. Their business consisted of a meat and grocery store and a meat peddling route. After his father's death on October 17, 1946, petitioner became sole owner of the business. The meat peddling route was discontinued after 1961. Petitioner put the following earnings into Government bonds during World War II: Date Issued
Denomination
Number
Cost
April 1942 $500
2
$ 750
April 1942
100
20
1,500
June 1942
100
20
1,500
$3,750
June 1944
100
4
$ 300
October 1944
1,000
1
750
November 1944
1,000
3
2,250
$3,300
Petitioner paid the following income taxes during the following years prior to 1959: Year
Income Tax Paid
1946
$ 199.00
1947
762.98
1949
347.80
1950
1,434.74
1951
981.26
1952
2,347.94
1954
345.36
1956
378.81
*473 Petitioner received the following income tax refunds for the years 1948, 1957, and 1958: Year
Refund of Tax and Interest
1948
(Unknown)
1957
$565.83
1958
689.22
In 1960, petitioner constructed a new store with 12,000 square feet of space, at a cost of $58,605.88, which he opened for business in May 1961. During 1961 he purchased equipment and fixtures for the new store at a total cost of $57,396.08. In addition, petitioner increased his inventory from $15,831.14 at the end of 1960 to $38,470.61 at the end of 1961, an increase of $22,639.47, making his total investment in the new store $138,641.43. When he stocked his new store with merchandise in May 1961, petitioner received $23,000 in credit from the Harrisburg Grocery Store. Petitioner paid off his credit balance of $18,183.15 by check on December 5, 1961. The new store is bigger than some supermarkets. It has three checkout counters with three cash registers and six meat scales. Nevertheless, generally only one checkout counter and one cash register were in use. The store operates more as a meat market and convenience store than as a supermarket. Petitioner's only employees in the store were *474 his wife, son, and brother. On occasion, his sister and brother-in-law would help out. A considerable portion of petitioner's business was attributable to the sale of meats. As a licensed butcher, petitioner was able to buy cattle locally and slaughter them himself. [3] In addition to the sale of meat at his grocery store, petitioner peddled meat in the surrounding community. Petitioner delivered the meat to his customers in refrigerated trucks. After the opening of his new store in 1961, petitioner discontinued his meat peddling routes. He did, however, continue to make deliveries of meat through the years in issue on the basis of orders called into the store. Petitioner's records reflect substantial gasoline purchases for the years 1959 through 1966. *475 Petitioner established and maintained his own single entry bookkeeping system. Petitioner's wife handled the cash register at the store. At the end of each day, she entered the expenses paid in cash during the day from the cash register. The cash, plus the expenses paid out, represented the day's total receipts. Petitioner added the daily receipts and recorded the monthly totals in his ledger book. His business expenses were recorded in the book on a daily basis. Petitioner dealt almost entirely in cash during the years in issue. His business purchases were made largely in cash, and he accumulated his business income in cash, depositing cash not needed for current operations either at the end of the year or more frequently. When he did use checks, it was his practice to bring the cash to the bank and write a check on it. As a result of his frequent use of cash, he deposited and withdrew substantial sums of money from the bank. In addition to these transactions, it was his common practice to purchase and redeem certificates of deposit, and to a lesser extent United States Savings Bonds. Beginning in 1965, petitioner became a frequent trader in stocks. In 1964, he held *476 stock costing him $5,100. By 1966, he had stocks and securities with a cost basis of $197,076.23. Despite the brisk activity in petitioner's brokerage account, he continued to conduct his stock transactions from a cash fund. When petitioner purchased stock, he did so by depositing cash in a checking account and drawing a check for the amount of the purchase. When petitioner sold stock he cashed the checks which he received in payment. Petitioner was known to carry large sums of money on his person on occasion, and had a special fondness for one thousand dollar bills. [4] Despite this apparent display of wealth, petitioner lived very frugally. He lived in a modest home, took no vacations, and apart from his plunge into the stock market, demonstrated no expensive habits. Following is a summary of petitioner's assets, liabilities and reserves, as constructed by respondent, for the period 1958 through 1970: In re: Harry H. and Ruth N. Wagner Docket No. 260-74 Assets
1958
1959
1960
Cash-on-Hand
$ 3,500.00
$ 3,500.00
$ 3,500.00
Cash-in-Bank [5]
120,525.67
168,427.94
184,403.29
U.S. Savings Bonds -
Series 'E'
67,687.50
52,687.50
61,687.50
Peceivable from Stock
Broker
0
0
0
Stock
0
5,100.00
5,100.00
Face Value of Coins in
Safe Deposit Box
803.91
803.91
803.91
Personal Auto's
4,837.80
6,837.80
10,837.80
Business Assets: Inventory
5,907.45
12,060.56
15,831.14
Depreciable Assets
47,045.07
51,125.71
98,700.49
Rental Property: 226 E. Derry Rd.
6,325.00
6,325.00
6,325.00
Residence: 303 E. Derry Rd.
5,000.00
5,000.00
5,000.00
Unidentified Asset.
Expenditure
0
0
0
TOTAL ASSETS YEAR END
263,632.40
311,868.42
392,189.13
Liabilities
Hummelstown National
Bank
0
0
0
R. T. Randall and
Company
0
0
0
Reserve for Depreciation: Rental Property
1,400.00
1,500.00
1,600.00
Business Assets
13,717.21
17,568.91
20,113.52
TOTAL LIAB.
& RESERVES
15,117.21
19,068.91
21,713.52
*477 1961
1962
1963
1964
1965
Cash-on-Hand
$ 3,500.00
$ 3,500.00
$ 3,500.00
$ 3,500.00
$ 3,500.00
Cash-in-Bank
190,216.86
208,044.91
178,806.34
228,821.47
271,213.85
U.S. Saving Bond - Series "E"
32,137.50
Receivable from Stock
Broker
Stock
5,100.00
5,100.06
5,100.00
5,100.00
30,717.13
Face Value of Coins in Safe Deposit Box
803.91
803.91
803.91
803.91
803.91
Personal Auto's
8,608.60
8,608.60
9,414.13
9,414.13
9,414.13
Business Assets:
Inventory
38,470.61
35,090.48
29,148.23
29,429.50
52,232,78
Depreciable Assets
162,890.92
165,131.12
159,174.94
159,174.94
159,465.66
Rental Property: 226 E. Derry Rd.
6,325.00
6,325.00
6,325.00
6,325.00
6,325.00
Residence: 303 E. Derry Rd.
5,000.00
5,000.00
5,000.00
5,000.00
5000.00
Unidentified Asset.
Expenditure
34,303.74
34,303..74
34,303.74
34,303.74
TOTAL ASSETS YEAR END
453,053.40
471,907.76
401,576.29
501,072.69
622,976.20
Liabilities
Hummelstown National Bank
R. T. Randall and Company
Reserve for
Depreciation:
Rental Property
1,700.00
1,800.00
1,900.00
2,000.00
2,100.00
Business Assets
30,656.16
42,967.65
47,492.88
56,267.62
63,469.42
TOTAL LIAB.
& RESERVES
32,356.16
44,767.65
49,392.88
59,267.62
65,569.42
*478 1966
1967
1968
1969
1970
Cash-on-Hand
$ 3,500.00
$ 3,500.00
$ 3,500.00
$ 3,500.00
$ 3,500.00
Cash-in-Bank
194,676.54
123,940.63
31,171.84
34,005.11
6,459.69
U.S. Savings Bonds - Series "E"
2,943.75
14,006.25
Receivable from Stock
Broker
14,583.44
Stock
197,076.23
261,427.78
253,686.29
361,255.36
396,415.75
Face Value of Coins in
Safe Deposit Box
803.91
803.91
803.91
803.91
803.91
Personal Auto's
4,000.00
4,000.00
5,890.00
5,890.00
5,890.00
Business Assets:
Inventory
53,591.75
52,947.62
52,537.16
58,375.00
59,250.00
Depreciation Assets
164,498.16
150,252.35
150,252.35
153,275.23
155,201.23
Rental Property:
226 E. Derry Rd.
Residence:
303 E. Derry Rd.
5,000.00
5,000.00
5,000.00
5,000.00
5,000.00
Unidentified Asset
Expenditure
84,303.74
174,849.71
278,351.16
278,351.16
278,351.16
TOTAL ASSETS YEAR END
724,977.52
776,722.00
795,198.96
900,453,75
950,961.74
Liabilities Hummelstown National
Bank
2,078.00
47,890.64
27,092.01
57,369.08
57,369.08
R. T. Randall and
Company
990.00
Reserve for Depreciation:
Rental Property
Business Assets
70,263.78
68,176.99
74,333.09
80,048.62
85,490.01
TOTAL LIAB. & RESERVES
73,323.78
116,067.62
101,425.10
137,417.30
142,859.09
*479 The parties agree with the figures set forth in the summary except for the cash on hand, inventories [6] for 1965 and subsequent years, and "unidentified asset expenditures." *480 Respondent originally contended that the cash on hand was $3,500, although on brief he also argues that even if there was a substantial cash hoard, it was the same at the beginning of 1959 and 1967.Petitioner argues that he had an opening cash hoard of $124,000. [7] We find that petitioner's cash on hand at the beginning of the period here in question was no more than $3,500. Respondent contends that petitioner used the following funds for unidentified assets and/or expenditures: [8]
a) $11,514 petitioner received on the redemption of U.S. Savings Bonds, Series E on April 10, 1962. b) $22,789.74 petitioner received on the redemption of U.S. Savings Bonds, Series E on April 19, 1962. c) $50,000 petitioner withdrew in $1,000 dollar bills from a joint savings account, account number 1572, at the Hershey National Bank on June 4, 1963. *481 Respondent computed petitioner's understatement of income as follows: In re: Harry H. and Ruth N. Wagner Docket No. 260-74 Description
1958
1959
1960
1961
TOTAL ASSETS:
263,632.40
311,868.42
392,189.13
453,053.40
Less: Liabilities & Reserve
for Depr.
15,117.21
19,068.91
21,713.52
32,356.16
NET WORTH
248,515.19
292,799.51
370,475.61
420,697.24
Net Worth Beginning of Year
248,515.19
292,799.51
370,475.61
Increase in Net Worth
44,284.32
77,676.10
50,221.63
ADJUSTMENTS: Additions: Income Tax Payments
1,710.78
2,032.49
2,108.25
Personal Inc. Premiums
2,081.20
7,508.00
7,499.50
Personal Expenses - Living
3,000.00
3,000.00
3,000.00
Personal Expenses - Other
1,820.00
1,820.00
1,820.00
Non-Deductible Loss -
Personal Autos
3,594.70
Reductions: Dividend Exclusion
(100.00)
(100.00)
(100.00)
Non-Taxable Portion -
Capital Gains
NET ADJUSTMENTS
8,511.98
14,261.29
17,922.45
ADJUSTED GROSS INCOME AS CORRECTED
62,796.30
91,937.39
68,144.08
DEDUCTIONS: Standard or Itemized Ded.
(500.00)
(500.00)
(1,000.00)
Exceptions
(1,800.00)
(1,800.00)
(1,800.00)
TAXABLE INCOME AS CORRECTED
50,496.30
89,637.39
65,344.08
TAXABLE INCOME PER RETURN
8,667.81
8,816.34
14,358.47
UNDERSTATEMENT OF TAXABLE INCOME
41,828.49
80,821.05
50,985.61
*482 Description
1962
1963
1964
1965
1966
TOTAL ASSETS
491,987.76
481,576.29
531,672.69
622,976.20
724,977.52
Less:
Liabilities & Reserve
for Depr. 44,767.65
49,392.88
58,267.62
65,569.42
72,222.78
NET WORTH
427,146.11
432,183.41
473,605.07
687,406.78
681,682.74
Net Worth Beginning
of Year
420,97.34
427,140.11
432,103.41
473,608.67
897,406.78
Increase in Net
Worth
6,442.07
5,643.20
41,421.66
83,001.71
94,246.96
ADJUSTMENTS
Additions: Income Tax Payments
2,136.38
2,948.17
3,136.88
8,148.96
Personal Ins. Premiums
7,229.30
7,162.05
7,002.40
6,809.95
6,792.60
Personal Expenses - Living 3,000.00
3,138.29
3,326.29
3,138.29
3,138.29
Personal Expenses - Other
1,620.00
2,422.87
3,240/00
2,340.00
1,604.81
Non-Deductible Loss
- Personal Assets
2,640.45
1,914.13
Reductions:
Dividend Exlusion
(100.00)
(100.00)
(200.00)
(200.00)
(200.00)
Non-Taxable Portion
- Capital Gains
(1,007/78)
(4,150.28)
NET ADJUSTMENTS
14,095.60
15,731.28
15,600.57
18,793.77
14,039.74
ADJUSTED GROSS INCOME AS
CORRECTED
DEDUCTIONS
90,638,58
20,774.58
57,110.33
99,595.48
100,286.70
Deductibles; Standard or
Itemized Ded.
(1,000.00)
(1,000.00)
(1,000.00)
(1,000.00)
(1,000.00)
Exceptions
(1,000.00)
(1,000.00)
(1,000.00)
(1,000.00)
(1,000.00)
TAXABLE INCOME AS CORRECTED
19,270/56
17,974.86
96,798.48
106,086.70
TAXABLE INCOME PER RETURN
8,214.67
12,548.61
14,394.12
19,677.72
28,937.52
UNDERSTATEMENT OF
TAXABLE INCOME
9,582,88
3,433.97
39,916.05
77,117.76
77,249.16
*483 OPINION Respondent has determined petitioner's income for the years in issue utilizing the net worth and expenditures theory. In using the net worth method, respondent first attempts to establish the taxpayer's net worth at the beginning of a given year. He then computes increases in the taxpayer's net worth in each succeeding year under examination, calculating the difference in the taxpayer's net worth at the beginning and the end of each year.To these increases certain adjustments are made including the addition of nondeductible expenditures, such as living expenses. If the total increases in net worth are substantially greater than the taxable income as reported by the taxpayer, respondent claims the excess is unreported taxable income, unless it can be traced to a nontaxable source (such as a cash hoard, gifts, inheritances, etc.). The parties agree on all of the elements entering the net worth calculation except for cash on hand, inventory for 1965 and 1966, and an item used in respondent's computations entitled "unidentified asset expenditure". At the outset, we note that any assessment for the years in issue is barred by the statute of limitations unless respondent *484 can show petitioner filed a false or fraudulent return with intent to evade tax. Section 6501(c)(1). In Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973), we approved the following definition of fraud: The term "fraud" means actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed and the courts will not sustain findings of fraud upon circumstances which at the most create only suspicion. * * * [Citation omitted]. Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b) Tax Court Rules of Practice and Procedure.Beaver v. Commissioner,55 T.C. 85, 92 (1970). The existence of fraud is a factual question which must be resolved by reference to all the evidence in the record. See Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). In making our analysis it would be convenient to focus on two periods--1959 through 1961 and 1962 through 1966.In the earlier period, respondent confined himself to a more or less *485 conventional analysis of the taxpayer's net worth, and the dispute turns on the amount of any beginning cash hoard. For the years 1962-1966, however, respondent added to petitioner's net worth a sum represented by "unidentified asset expenditures." We begin by focusing on the later years--1962-1966.The centerpiece of the respondent's case for these years is his assertion that petitioner used current income to either amass a large hoard of funds or make large nondeductible expenditures, which although not discoverable, should be included in determining his increase in net worth. Specifically, respondent contends that the following funds were used for unidentified assets and/or expenditures: a) $11,514 petitioner received on the redemption of U.S. Savings Bonds, Series E on April 10, 1962. b) $22,789.74 petitioner received on the redemption of U.S. Savings Bonds, Series E on April 19, 1962. c) $50,000 petitioner withdrew in $1,000 dollar bills from a joint savings account, account number 1572, at the Hershey National Bank on June 4, 1963. In essence, respondent argues that since he was unable to trace these funds, they must have been used in some fashion, either to acquire *486 some unknown asset or to make some undiscovered and nondeductible expenditure. Respondent's case for 1962 to 1966 depends almost wholly on his use of this "unidentified asset expenditures" account. While in a particular case, this methodology may have merit, it is inappropriate in the case before us. The addition of sums to the unidentified asset expenditures category totally ignored the manner in which petitioner handled his financial affairs. Petitioner conducted his business transactions through the use of what was essentially a revolving cash fund. During the years in issue, petitioner engaged in literally thousands of transactions. Sometimes the funds from the sale of stock or the redemption of certificates of deposit were immediately reapplied to purchase other assets, sometimes they were not. Moreover, when some other asset was purchased, it was highly unlikely that the cost of that asset would correspond to the exact dollar amount of the sum previously added to the cash fund. The methodology respondent used for tracing was limited both in duration and amount. While it is not entirely clear, funds were generally not traced beyond an arbitrary cut-off period of seven *487 days nor were amounts of less than $5,000 traced.The major defect inhering in this procedure is the danger of duplication. Given the short turnover period the respondent allowed (seven days), and the rather high amounts required to warrant any tracing ($5,000), this is a very significant defect and a substantial danger. For example, assume a bond was redeemed and the cash from that redemption went back into a cash fund. If nothing was purchased from the fund within seven days, or the funds were reinvested in amounts of from $5,000 to $6,000, or some combination of the two, respondent would conclude that the funds from the redemption went into an unidentified asset expenditure. Yet if stock was purchased from the fund beyond the tracing period, in amounts below the tracing criteria, or some combination of the two, respondent would also include the stock as part of the taxpayer's net worth. After careful study of the record, we believe that example is typical of what often happened here, and respondent's agent, on cross-examination, admitted some probable instances of duplication when confronted with certain specific examples. Some of these admittedly related to the years 1967 *488 through 1970, which respondent has now conceded. However, we feel no more comfortable with the same theory in the earlier years that respondent has discarded in the later years. Respondent noted on brief that petitioner's argument that large sums charged to the "unidentified asset expenditure" account for 1967 and 1968 were ultimately invested in the stock market and then said "based on the record in this case, this is a plausable [sic] explanation." We believe this explanation to be no less plausible for 1962 to 1966. In fact, it is even more likely that the funds designated as unidentified asset expenditures for the years 1962 through 1966, were ultimately reinvested in visible assets (e.g., stock) than the funds for the years conceded by respondent. In the 1967 through 1970 period, stock market investments increased by $134,987.97, from $261,427.78 to $396,415.75.At the same time, cash in bank went down from $194,676.54 to $46,459.69, a difference of $148,216.85, and bank loans increased from $2,070 to $57,369.08, a difference of $55,299.08, both of these representing obvious visible sources for the stock market investments. By contrast, in the 1962 through 1966 period, *489 stock market investments increased by $191,976.23, from $5,100, to $197,076.23. In the same period, cash in the bank actually increased from $190,216.86 to $194,676.54. Comparing the two periods 1962 to 1966 with 1967 to 1970, stock market investments increased by more during the 1962 through 1966 period, while uses of visible sources for the stock market investments were actually much greater in the later period than they were in the earlier period. In sum, we believe that the method used by respondent in determining petitioner's net worth was not particularly well conceived and failed to take into account the rather extraordinary nature of the individual taxpayer. We recognize that the large cash withdrawals are likely, when considered in the total circumstances of this case, to create strong suspicions of fraud. It is undisputed that petitioner withdrew $50,000 in $1,000 bills from Hershey National Bank on June 4, 1963. He told several inconsistent stories about how he used these funds, or "might" have used them, in the final analysis relying heavily on a lapse of memory. We are skeptical that he would be unable to recall what he did with such a large sum of money. In *490 many other instances it was extremely difficult to tell when petitioner's testimony was truthful or mendacious. He often equivocated, sometimes he was understandably unable to reconstruct events occurring a decade and a half ago, and on other occasions we strongly suspect he deliberately fabricated his testimony, often on an adhoc basis. Nevertheless, petitioner was a suspicious man, who became increasingly distrustful of respondent's agents, which undoubtedly explains some of the equivocation.While the issue in these years is hardly free from doubt, we are ultimately persuaded that the defects in the centerpiece of respondent's case--the "unidentified asset expenditures" line of the net worth statement--prevent respondent from carrying his burden of proving fraud by clear and convincing evidence. Congress did not say that when sloppy books and records exist, or when there has been extensive use of cash, or when other circumstances creating strong suspicions of fraud exist, that the statute may be opened up. Rather, it is well-settled that fraud must be proven by "clear and convincing evidence." Rule 142(b), Tax Court Rules of Practice and Procedure; Beaver v. Commissioner,55 T.C. 85, 92 (1970). *491 Obviously, this language provides qualitative rather than quantitative criteria, and is not amenable to mathematical certainty. Necessarily, when a record is as confused as this one, encompassing in the earliest year a period that occurred nearly two decades ago, there will be some doubt and uncertainty about the conclusion reached in the light of the Congressionally-mandated criteria. This is the nature of the process, and while we believe the conclusion to be much closer than petitioner concedes, we nevertheless hold that respondent has failed to sustain his burden of proof in the years 1962 to 1966. The years 1959-1961 are an entirely different matter, since respondent's calculations do not involve a line for "unidentified asset expenditures." Standard net worth plus expenditures techniques were used for these years, and as petitioner noted on brief, in these years "the crux of the dispute is the existence of a beginning cash hoard." Or, as petitioner put it in his opening statement, "for the earlier years, the result will pretty much depend upon the Court's judgment as to the petitioner's allegation of opening cash." The petitioner claims a cash hoard of $124,000 at the *492 end of calendar year 1958. Respondent contends opening cash on hand was $3,500. We find petitioner's claim preposterous and therefore sustain respondent on this point. We begin by noting that petitioner told so many inconsistent stories concerning his cash hoard over such an extended period of time that the search for the truth has proved elusive in the extreme. In 1967, petitioner initially stated that he had received a substantial inheritance from his father and gifts from his mother. Based on his father's will, which was introduced into evidence; on statements made by petitioner (and corroborated by Mrs. Wagner) regarding the circumstances and conduct of petitioner's parents; and based on petitioner's testimony on the subject, which we found wholly unreliable on this point, we do not believe that he received any money from his parents. [9]
*493 Additionally, petitioner on several occasions also told respondent's agent that he "did not hoard money" and pretty much conceded he did not have any large cash hoard. Referring to large cash amounts he told these agents that "I would never keep money like that around." Prior to the present trial petiioner stated on several occasions that he kept on hand cash accumulated during the current year, but always deposited it at the end of the year. At one point, petitioner told respondent's agents that he deposited his receipts at years' end never retaining any more than $3,500 for bills beginning the following year. This story was corroborated by statements made by Mrs. Wagner. [10] At the trial several tin boxes were produced and a virtually incomprehensible story told concerning the sequential transfer of cash from one box to another at various periods. A good deal of the story appeared to be created from whole cloth on an adhoc basis, with emendations invented on the spot to cover weak points as they appeared. *494 The final resting place of the huge cash hoard petitioner claims (some of which filtered its way through the series of tin boxes) was some cigar boxes resting in a hope chest in petitioner's attic. It is beyond belief that petitoner laid up this treasure "where moth and rust doth corrupt and where thieves break through and steal." Not to mention the danger of fire. The record is clear that Mrs. Wagner was unaware of any large cash hoard to be removed in case of fire.[11]
In addition to the extreme improbability that petitioner would expose such a large principal amount to loss, it is difficult to believe that he would forego the substantial interest that a safe lodging of this money with the bank would provide. As for petitioner's claimed lack of confidence in banks, we note that he made substantial use of them throughout the period in question, it being stipulated that he had as much as $271,213.85 in *495 banks in 1965. It is undisputed that petitioner did on occasion carry around substantial numbers of $1,000 bills. But we suspect that as soon as this display reaped its psychological reward, petitioner reinvested the large bills in a safe place calculated to yield a reasonable return. [12] We do not, therefore believe that the mere ostentatious display of $1,000 bills on a few isolated occasions establishes a cash hoard at the beginning of 1959 in spite of the overwhelming evidence that none existed. We acknowledge that we are not entirely comfortable in reaching different conclusions with regard to the early and later years. However, the Court must decide the case on the record made, and as to the later years respondent simply failed to sustain his heavy burden of proof. Additionally, we note that petitioner discontinued his meat peddling business after 1961. [13] This loss of income and smaller than expected volume in the new store may justify this divergence, at least in part. *496 Respondent attempted to salvage all of the years through 1966 with an argument based on two items from the record relating to petitioner's alleged cash hoard. The first of these items is a scrap of paper, on which petitioner wrote down some figures, apparently arriving at $173,000 as his cash hoard sometime in 1966. The second item was the following testimony of petitioner from the trial: Well, sometimes the money went into that chest, but there -- here I was -- after '66, I started using money to -- I didn't start using that money, I believe, until '67 or '68, when I run out of money in the savings accounts, then I started buying and paying for them stocks -- around '67 or -- I'm not sure. It happened after '65 when I started playing the stock market. The slip of paper records a summary of fabrications recorded and then made available to respondent very late in the sequence of events before us. Respondent argues that assuming the cash hoard was in existence, petitioner's testimony indicates it remained intact through 1966. As recounted earlier, respondent's case for 1962-1966 suffers from deficiencies in his theory of unidentified asset expenditures as applied to this case. *497 However, we do not believe that his attempt to salvage these years by circumventing these deficiencies with an alternative theory concedes the existence of an opening cash hoard at the beginning of 1959. We reject respondent's attempt to breathe new life into the years 1962-1966 by focusing on petitioner's final prevarication regarding a cash hoard.Conversely, we do not believe that by arguing for certain consequences assuming the truth of petitioner's statement as to the use of his claimed cash hoard, respondent concedes the existence of such a hoard. Respondent's entire case was predicated on the absence of any large hoard and on this point we find his case virtually unassailable. [14] We therefore sustain respondent's determination for the years 1959-1961. *498 Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Since Ruth N. Wagner is a party to this proceeding solely by reason of filing a joint return, Harry H. Wagner will be referred to as petitioner.↩
3. Petitioner's total cattle purchases per records, and petitioner's total purchases per his tax returns, were during the years 1959 through 1966, as follows: ↩
Total Cattle Purchases
Total Purchases Year
Per Ledger Books
Per Tax Returns
1959
$34,616.41
$194,886.45
1960
33,374.24
177,523.49
1961
31,439.59
224,319.51
1962
37,582.78
222,236.00
1963
35,487.67
233,107.85
1964
35,331.48
242,890.70
1965
38,168.44
254,440.23
1966
39,668.48
247,168.58
4. On one occasion in 1963, petitioner withdrew $50,000 in $1,000 bills from a savings account at the Hershey National Bank in Hershey, Pennsylvania.↩
5. Cash in bank consists of cash on deposit in checking accounts, savings accounts and certificates of deposit.↩
6. The controversy over inventories was the result of a compensating entry made by petitioner in reporting his sales in 1965. As previously noted, petitioner's wife kept a daily receipts record consisting of two columns. In the first column she recorded the amount of cash in the cash register at the end of the day. When petitioner recorded the monthly totals from his daily receipts record in his ledger book for the year 1965, he recorded only the monthly totals of the first column. Thus, he understated his cash receipts recorded in his daily receipts record by the total of the second column, $31,170.20. When computing his taxable income from his books and records for 1965, petitioner realized that his income as computed was incorrect, given the substantial cash petitioner had accumulated and had on hand at the end of the year. In trying to correct this disparity, petitioner raised his inventory for the year end by $22,793.28, thereby increasing his taxable income for the year. Petitioner's inventory has thus been inflated by this amount every year since 1965.↩
7. Petitioner contends that he received $30,000 from each of his parents as a gift, that he accumulated $39,000 from yearly savings of $3,000 each and that he had $25,000 from pre-World war II accumulations, a total of $124,000.↩
8. Respondent originally contended that in addition to the above, cash from the following sources were also used for unidentified assets and/or expenditures: 1967
Source
Cash Received
May 10
600 shares of Harsco Corp.
$13,589.72
June 12
Hummelstown National Bank -
54,600.00
Certificate of Deposit
No. 386
July 17
U.S. Savings Bonds, Series E
6,412.50
August 7
Hershey National Bank Savings
Account No. 11040
13,000.00
December 26
U.S. Savings Bonds,
Series E
2,943.75
TOTAL
$90,545.97
1968
Feb. 5
Farmer's Bank & Trust Co.
$20,000.00
Certificate of Deposit
No. 22609
June 4
200 shares of Hershey Foods
6,120.87
June 12
200 shares of Hershey Foods
6,120.87
June 13
400 shares of Hershey Foods
12,838.72
Nov. 8
300 shares of Bethlehem Steel
9,740.97
Dec. 2
600 shares of Hershey Foods
19,407.32
Dec. 2
500 shares of Hershey Foods
16,234.97
Dec. 3
400 shares of Hershey Foods
13,037.73
TOTAL
$103,501.45
As noted, however, respondent has now conceded the years after 1966.↩
9. That is, other than small incidental gifts and possibly the $1,000 specific bequest each child was to receive under the will of petitioner's father. We note that although petitioner operated the business with his father, he was required to purchase his father's share at the latter's death. We also note that he made several statements to respondent's agents that, if not flatly contradicting the claim of substantial inheritances and/or gifts, are inconsistent with such a claim.↩
10. Mrs. Wagner did not testify at the trial, but an interview she gave to respondent's agent was stipulated. One cannot read the interview without being impressed by her candor and integrity. She clearly found the notion of a large cash hoard virtually impossible to believe. However, while we find her statements consistent with our conclusion, we do not place great reliance on them, since her familarity with the business and family financial affairs was quite clearly limited, being based primarily on her role in operating the check-out counter.↩
11. A picture taken the Sunday before the trial shows the chest and cigar boxes in the attic of petitioner's frame home where these huge sums were allegedly kept.We would find it easier to believe in the abominable snowman than to believe petitioner's story on this point.↩
12. Indeed, throughout all of the later years, we recognized that this probably occurred.↩
13. Respondent contends that petitioner conducted the meat peddling route through 1966.However, the returns before us demonstrate that the last year petitioner took a deduction for a meat peddling license was in 1961. The disappearance of this item from his return, prior to his difficulties with the Internal Revenue Service, leads us to believe petitioner's assertion that he discontinued the meat peddling route at this time.↩
14. During the trial, petitioner argued that his books and records were of the garden variety expected of a small business and sufficiently accurate to preclude reconstruction of income by the net worth method. We disagree completely.Among many factors we might point to, the books improperly recorded cattle purchases and inventory was deliberately understated as a compensating error. Petitioner stated he put his interest in with his business income in the early years, and this is not true. Additionally, we do not believe the books properly reflected his income from the meat peddling route.↩